UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,


                            -against-                                       13 Crim. 0506 (LAK)



CHRISTIAN MUNOZ,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


                Appearances:

                Brook E. Cucinella
                Margaret Garnettt
                Assistant United States Attorneys
                Preet Bharara
                UNITED STATES ATTORNEY

                George R. Goltzer
                *Attorney for Defendant*



LEWIS A. KAPLAN, *District Judge.*

        Christian Munoz was arrested in the Bronx, New York, on May 1, 2013 for possession of marijuana. He was transported to the 41st precinct where a sergeant questioned him, purportedly in order to obtain information concerning local criminal activity. This questioning ultimately led the sergeant to believe that Munoz, a convicted felon and parolee, owned a gun that was stored at another location. Later that day, the police recovered the gun from the apartment where Munoz lived and then elicited a confession that Munoz owned it. Munoz now moves to

suppress the gun and his statements to police.

These are the Court's findings of fact and conclusions of law after a two-day suppression hearing at which the government introduced testimony from five police officers and one layperson present during the search of the apartment.[1]

*Factual Background*

On the afternoon of May 1, 2013, Officer Homer Henriquez and two other New York City police officers observed a known drug user exchange cash for "small objects" with someone sitting in a parked minivan.[2]  The officers approached the van, and Officer Henriquez observed three individuals inside, including Munoz and another individual, both of whom were seated in the back. Henriquez saw them "thr[owing] an object" believed to be a marijuana cigarette "from [their] face

---

[1]

    Munoz submitted two affidavits in support of his position that the police officers did not have probable cause to arrest him and coerced his and his father's consent to search the apartment.  The Court considers these affidavits, but affords them less weight than credible testimony offered at the hearing.  *See generally United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) ("Although defendant submitted an affidavit . . . it was not clearly erroneous for the District Court to credit the officers' testimony over defendant's affidavit." (citation omitted)); *DiMattina v. United States*, 13-CV-1273 (JBW), 2013 WL 2632570, at *22 (E.D.N.Y. June 13, 2013) ("DiMattina has chosen not to testify in his own defense. That is his constitutional right. Yet, he cannot use that right as shield to protect him from potential criminal liability while concomitantly wielding his affidavits as a sword to cast doubt on testimony found credible by the court as fact-finder. Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight."); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("Consequently, this Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to Al–Marri's version of the facts.") (citation omitted).

[2]

    Tr. at 3:19-6:15.

area[s] to the ground."[3]  The police requested that the three individuals step outside.  When they opened the door, a "strong odor of marijuana" emanated from the vehicle.[4]

The officers then arrested Munoz and his two companions and took them to the police precinct.[5]  Once there, field intelligence officer Sergeant Christopher Pasquale began to question Munoz without first advising him of the *Miranda* warnings.[6]  Sergeant Pasquale told Munoz that the questioning was to "debrief" Munoz on his knowledge of crimes in the area, not to interrogate him with respect to crimes that he may have committed.[7]  Shortly into the questioning, Munoz said that "maybe [he] need[ed] a lawyer,"[8] but Sergeant Pasquale insisted that he did not "desire [Munoz] to incriminate himself in any way."[9]

Notwithstanding this assurance, Sergeant Pasquale – after Munoz gave some answers that he regarded as incredible or inconsistent – accused Munoz of dishonesty, remarking "you know, you're lying so much I wouldn't be surprised if you had a gun."[10]  Sergeant Pasquale noted an

---

[3]      *Id.* at 3:25-4:8.  The officers collected marijuana cigarettes from the vehicle and vouchered them as evidence.  *Id.* at 6:11-13.

[4]      *Id.* at 5:22-25.

[5]      *Id.* at 6:15.

[6]      *Id.* at 45:22-46:3.

[7]      *Id.* at 47:21-48:19.

[8]      *Id.* at 19:21.

[9]      *Id.* at 20:1.

[10]      *Id.* at 20:9-13.

immediate shift in Munoz's body language.  "He stopped making eye contact. Looked down, and just slumped in the seat."[11]  The interview concluded and Sergeant Pasquale went elsewhere to question another individual who had been arrested with Munoz.[12]  When asked whether he had ever seen Munoz with a firearm, that individual responded that he had and that he believed the gun was at Munoz's home.[13]

Sergeant Pasquale and four other police officers traveled to Munoz's apartment, hoping to obtain consent to search it for the weapon from Munoz's father who, they had learned, lived in the apartment.[14]  They did not have a search warrant and Sergeant Pasquale – the officer in charge – admittedly knew that the police did not have a sufficient basis to obtain a search warrant under New York law.[15]  After waiting in the building lobby for some time, Sergeant Pasquale and one other detective returned to the police precinct to seek Munoz's consent to search while the other three officers waited outside the apartment for someone to open the door or return home.[16]

Upon arriving at the precinct, Sergeant Pasquale and another officer – Detective Lingeza – told Munoz that officers were waiting for his father to return to the apartment.[17]  If

---

[11]

*Id.* at 20:14-17.

[12]

*Id.* at 20:23-24.

[13]

*Id.* at 21:20-22:2.

[14]

*Id.* at 23:6-24:3.

[15]

*Id.* at 39:3-40:18.

[16]

*Id.* at 26:22-27:9.

[17]

*Id.* at 26:22-28:25.

Munoz's father consented to the search and Munoz denied that he owned the gun, they said, the apartment's other occupants would be "subject to arrest."[18]  And if neither Munoz nor his father consented to the search, Sergeant Pasquale said that the police would notify Munoz's parole officer, who would search the apartment and find the gun.[19]  Munoz became emotional and, in exchange for an assurance that his father would not be arrested, consented to the search.[20]  Shortly thereafter and in response to questioning, Munoz revealed that the weapon was "on a chair in the living room."[21] He was not read his *Miranda* rights at any point prior to or during this conversation.[22]

At approximately 8:45 p.m.,[23] while this exchange was taking place at the police precinct, the three police officers who were positioned at Munoz's apartment gained entry and secured consent to search from Munoz's father.[24]

After waiting outside of the apartment for a period of time, Munoz's brother, Christopher Munoz ("Christopher"), and a female companion left the apartment.[25]  The police approached them and asked to go inside in order to avoid "put[ting] their business out in the

---

[18]

    *Id.* at 28:5-25.

[19]

    *Id.*  Sergeant Pasquale did not contact parole at any time that evening.  *Id.* at 40:23-41:1.

[20]

    *Id.* at 29:6-11, 30:8-15; Ex. 1.

[21]

    Tr. at 31:16-21.

[22]

    *Id.* at 28:2-8.

[23]

    *Id.* at 38:1-4.

[24]

    *Id.* at 29:12-30:1.

[25]

    *Id.* at 81:5-9.

hallway."[26] Christopher invited the officers inside where they learned that Alipio Munoz ("Alipio"), the registered tenant and Christian and Christopher's father, was in the living room towards the back of the apartment.[27] They asked who else was present in the apartment but did not conduct a security sweep.[28]

Gilberto Gonzalez, a friend of the family who was renting a room in the apartment, returned home at least several minutes later. He speaks both Spanish and English and agreed to translate so that the police could communicate with Alipio, who speaks Spanish and broken English.[29] Through Gilberto, the police explained to Alipio that they were there to retrieve a gun that Munoz had left in the apartment and they requested consent to search.[30] Gilberto testified that the police warned Alipio that they were waiting for a warrant and said that if the warrant arrived before they obtained consent to search and they found the gun, "they *were going to* arrest everyone who was in the house."[31] Officer Fidanza, in contrast, said that she told Alipio that "with a search warrant everyone in the apartment was *subject to getting arrested* since that's the law, and [that] he

---

[26]      *Id.* at 81:18-25, 115:18-116:1.

[27]      *Id.* at 83:9-18, 84:9-12.

[28]      *Id.* at 84:20-85:2, 96:13-97:7.

[29]      *Id.* at 84:20-21, 85:24-86:6. Christopher does not speak fluent Spanish and thus was unable to translate for his father. *Id.* at 71:2-20.

[30]      *Id.* at 86:9-19. Officer Edouard testified that he and Officer Fidanza, who he described as a petite female, predominantly spoke with Alipio. *Id.* at 86:20-87:4.

[31]      *Id.* at 66-21-67:1 (emphasis added).

seemed to understand."[32]

In any event, Alipio verbally granted the police permission to search the area where Munoz slept.[33]  He later signed a Spanish language consent form.[34]  Shortly after the officers began their search, an officer at the precinct with Sergeant Pasquale sent a text message to one of the officers on the scene informing him that, according to Munoz, the gun was located in a bag on the desk chair.[35]  The police then retrieved the gun.[36]

At approximately midnight, Officer Fidanza read Munoz the *Miranda* warnings, which Munoz waived.  He then admitted verbally and in writing to having purchased the gun.[37]

*Discussion*

I.      *Probable Cause to Arrest Munoz*

The Fourth Amendment permits a police officer to make an "investigatory stop[] of

---

[32]

> *Id.* at 109:3-5 (emphasis added); *see also id.* at 117:9-118:1.
>
> According to one of the officers who testified, Alipio apparently was "alert" and "very aware [of] what was going on."  *Id.* at 87:11-13.  Gilberto provided a contradictory account, explaining that Alipio is "an ill person" and that he "didn't know what was going on.  He was afraid.  He was nervous.  What he wanted is [sic] to finish with the situation."  *Id.* at 67:11-13.  It is undisputed that Alipio and his family stated that Alipio suffers from a heart condition.  *Id.* at 113:6-16.

[33]

> *Id.* at 67:21-24.  This was the only part of the apartment that the police requested consent to search.  *Id.* at 109:9-12.

[34]

> *Id.* at 110:3-111:14; Ex. 2.

[35]

> *Id.* at 89:18-25, 122:23-125:21; Ex. 3.

[36]

> *Id.* at 124:19-21.

[37]

> *Id.* at 32:10-35:11; Ex. 6.

persons or vehicles" where the officer has "reasonable suspicion to believe that criminal activity 'may be afoot.'"[38]  Reasonable suspicion is based on whether an officer had a "'particularized and objective basis' for suspecting legal wrongdoing" considering the totality of the circumstances.[39]

"Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime."[40]  In this context, an officer has probable cause when he reasonably believes that there is a "'fair probability' that contraband or evidence of a crime will be found."[41]  An officer's "experience and training may allow [him] to discern probable cause from facts and circumstances where a layman might not."[42]  Probable cause to arrest exists where "a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested."[43]

Officer Henriquez credibly testified that he observed what, based on his knowledge of and experience with the neighborhood and its inhabitants, he believed to be a drug sale.  While approaching the van, he observed Munoz and another individual throw objects that looked like

---

[38]

*United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted).

[39]

*Id.*

[40]

*United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (citing *Carroll v. United States*, 267 U.S. 132, 151-62 (1925)).

[41]

*Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[42]

*Id.* (citing *United States v. Price*, 599 F.2d 494, 501 (2d Cir. 1979)).

[43]

*United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004).

marijuana cigarettes from their mouths to the vehicle floor.  These observations provided Officer Henriquez with reasonable suspicion to believe that the occupants were engaged in criminal activity and to request that they step outside.  The "strong odor of marijuana" that wafted from the vehicle and marijuana cigarettes that the officers retrieved from inside the van provided additional cause to believe that an offense had been committed and to arrest Munoz and his two companions.

The only evidence contradicting this sequence of events comes from Munoz's affidavit.  He there claims that "to [his] knowledge and observation, nobody in the vehicle was committing any crime or violating the law in any way."[44]  The Court credits Officer Henriquez's testimony over Munoz's affidavit, which is unsupported by testimony and was not subject to cross examination.  It thus finds that the government has satisfied its burden of demonstrating by a preponderance of the evidence that the police had probable cause to arrest Munoz and to search the vehicle.


## II.     *Voluntariness of Consent to Search*

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"[45]  One such exception is consent. If it relies on consent, the government must demonstrate by a preponderance of the evidence[46] that

---

[44]

Munoz Aff. [DI 3] ¶ 3.

[45]

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (alteration in original).

[46]

*United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

the "consent was, in fact, freely and voluntarily given"[47] based on the totality of the circumstances.[48] In other words, "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force."[49] And "[m]ore than 'acquiescence in a show of authority' is necessary to establish voluntariness."[50]

The standard for evaluating consent is "'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect? Thus, 'the Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the [] consent permitted him to conduct the search that was undertaken.'"[51] In determining objective reasonableness, however, "it is appropriate to consider the 'particularities of the situation that is presented in any given case' and the 'possibly vulnerable subjective state of the person who consents.'"[52] Other pertinent factors include "whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, [and] whether the defendant had knowledge of the right to refuse consent."[53] The "individual's age,

---

[47]   *Schneckloth*, 412 U.S. at 222.

[48]   *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

[49]   *Schneckloth*, 412 U.S. at 228.

[50]   *United States v. Guzman*, 724 F. Supp. 2d 434, 442 (S.D.N.Y. 2010) (citations omitted).

[51]   *Garcia*, 56 F.3d at 423 (citations omitted).

[52]   *United States v. Lavan*, 10 F. Supp.2d 377, 384 (S.D.N.Y. 1998) (quoting *Schneckloth*, 412 U.S. at 227).

[53]   *Id.* (citations omitted).

education, and intelligence; [] the length of detention; [] the use of physical punishments or deprivations; [] and whether the alleged consenting person was advised of his constitutional rights"[54] are also relevant factors.  Of particular relevance, consent is not necessarily rendered involuntary where the police truthfully state that they can or will obtain a search warrant if consent is not given.[55]  On the other hand, where the police lie to a subject and claim to have a search warrant when they in fact have none, any consent to search is deemed involuntary.[56]

This case lies between these two extremes.  It is not clearly established whether consent is voluntary where, as here, the police threaten to obtain a search warrant in the absence of consent despite knowing that a search warrant most likely would not issue.  The Second Circuit indicated in *United States v. Vasquez*[57] that consent obtained in such circumstances may be invalid but it did not decide the issue.[58]  At least one court in this district subsequently has held that consent obtained based on a false representation that the police could secure a search warrant is involuntary.[59]

---

[54]

*United States v. Todd*, 12 CR 45 (RJS), 2013 WL 499857, at *6 (S.D.N.Y. Jan. 28, 2013) (citation omitted).

[55]

*See, e.g.*, *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983) (holding that truthfully informing a property owner that, absent consent, a search warrant could be obtained did not negate the voluntariness of the consent).

[56]

*See Bumper v. North Carolina*, 391 U.S. 543, 549-50 (1968).

[57]

638 F.2d 507 (2d Cir. 1980).

[58]

*Id.* at 528-29 (expressing doubt as to whether consent was voluntary where there was no clear likelihood that the police would obtain a warrant, but they threatened to do so).

[59]

*See United States v. Cruz*, 701 F. Supp. 440, 447 (S.D.N.Y. 1988) (relying on *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980), in holding that "[i]n the case at bar, it is manifest

This is a sensible rule and a natural extension of the Supreme Court's holding in *Bumper v. North Carolina*.[60]  The Court there held that consent is not voluntary where the police falsely represent that they have a search warrant.[61]  In such circumstances, the Court reasoned, the false claim of lawful authority to search effectively coerces the consent.[62]  Where, as here, the police falsely claim only that they will or can obtain a warrant, the statement's coercive force perhaps is more attenuated, but it remains.  The subject has no legitimate choice when he is led to believe that a search is inevitable when, in fact, it is not.

Similarly, offering a "good deal" – for example, a limited search or a loved one's freedom from arrest – does not automatically negate voluntariness,[63] whereas a threat to arrest the accused's family member absent probable cause to do so broadly has been held coercive.[64]

---

that Cruz was misinformed. Her consent to the search was clearly obtained by a reasonable reliance on Occhipinti's false representation of his ability quickly to obtain a warrant. In consequence, Cruz' consent to the search was not voluntary.").  *But see United States v. Lopez*, 752 F. Supp. 616, 618-19 (S.D.N.Y. 1990) (holding that an agent's unsubstantiated statement that he would obtain a warrant absent consent did not render consent involuntary where the court believed that the individual who gave consent to search "would have consented to the search regardless of Agent Devaney's comment about applying for a warrant" and the agent "did not represent his ability to obtain a warrant in such a way that Mrs. Lopez could only have concluded that the warrant was a fait accomplis.").

[60]   391 U.S. 543 (1968).

[61]   *Id.* at 550.

[62]   *Id.* at 458-50.

[63]   *United States v. Memoli*, 333 F. Supp. 2d 233, 237-38 (S.D.N.Y. 2004).

[64]   *E.g. United States v. Ortiz*, 943 F. Supp. 2d 447, 456-57 (S.D.N.Y. 2013) (collecting cases).

A.    *Alipio's Consent*

The government argues that it has sustained its burden of demonstrating that Alipio consented to the search of his apartment voluntarily because the police acted reasonably, Alipio was alert, aware, and understood the events taking place, and the police's statement of intent to obtain a warrant did not invalidate consent.  Munoz counters that Alipio's consent was involuntary because the police misleadingly informed him that if they "couldn't get consent that [they] were going to get a search warrant to remove the firearm" and "with a search warrant everyone in the apartment was subject to getting arrested" if a gun were found.[65]

The hearing testimony suggests that the police treated Alipio with respect.  There was no show of force, weapons were not drawn, and handcuffs were not applied.  Indeed, the officers apparently engaged in casual small talk with Christopher at various times while in the apartment. Although Alipio has limited English proficiency, the police communicated with him through a translator, and Munoz does not argue that his father was unable to understand what the police were asking or to what he ultimately consented.

Weighing against voluntariness, however, are Gilberto's testimony that Alipio was unwell, "didn't know what was going on [and] . . . was afraid [and] nervous"[66] and Officer Fidanza's statement regarding the police's ability to obtain a search warrant.  As noted, there is some disagreement over Officer Fidanza's exact words in this regard.  On the one hand, Gilberto testified that the police warned Alipio that they were waiting for a warrant and said that if the warrant arrived before they obtained consent to search and they found the gun, "they *were going to* arrest everyone

---

[65]    Tr. at 108:18-20, 109:3-5.

[66]    *Id.* at 67:11-13.

who was in the house."[67]  Officer Fidanza, on the other hand, said that she told Alipio that "with a search warrant everyone in the apartment was *subject to getting arrested* since that's the law, and [that] he seemed to understand."[68]

It is unnecessary to resolve this dispute over the precise language used, as Officer Fidanza at least clearly implied that the police could and would obtain a search warrant if Alipio did not consent to the search.  But that statement or clear implication, whichever it was, was highly misleading.  As Sergeant Pasquale acknowledged at the hearing, he was aware that the police could not have obtained a warrant based on the information they had at the time.[69]  The government argues that Officer Fidanza did not discuss whether the police could or would get a search warrant with Sergeant Pasquale but it has presented no evidence to suggest that she actually believed that a warrant could have been obtained.  Indeed, it strains credulity to think that she would have had any basis for believing there were grounds for a court to issue a search warrant in the circumstances. She either did not know what information the police were relying on, in which case it would have been improper and illogical for her to assume that it was possible to obtain a search warrant, or she did know, in which case she would have known also that the police had insufficient evidence to

---

[67]  *Id.* at 66-21-67:1.

[68]  *Id.* at 109:3-5 (emphasis added); *see also id.* at 117:9-118:1.

[69]  The only information they had that there might be a gun in the apartment was the statement to Sergeant Pasquale from the other occupant of the van. Under the *Aguilar-Spinelli* test, applied by New York courts in determining whether statements obtained from an informant establish probable cause to issue a warrant, the police must demonstrate "(1) the veracity or reliability of the informant, and (2) the basis of the informant's knowledge." *Delgado v. City of New York*, 86 A.D.3d 502, 507, 928 N.Y.S.2d 487, 493 (1st Dep't 2011).  The police here would have been unable to satisfy the reliability prong because the informant was not a known informant, was not under oath, did not make a statement against penal interest, and there were no known facts corroborating his statement.  *See id.*; Tr. at 40:2-18.

apply successfully for a search warrant under New York law.

Thus, this case is not akin to those in which the police represent accurately their intent or ability to obtain a search warrant. Instead, it is analogous to *United States v. Cruz*,[70] in which a court in this district held that a government agent's misrepresentation that he would obtain a search warrant vitiated consent.[71] In the former instance, the statement is merely truthful advice of the most likely sequence of events absent consent. In the latter instance, however, the statement becomes coercive because it wrongly suggests that a search is inevitable.

The government attempts to overcome this hurdle by insisting that the police would have called Munoz's parole officer, who would have been legally entitled to search Munoz's apartment without a warrant, and that he would have found the gun. Were it clear or highly likely that parole would have conducted a timely search in these circumstances, this argument might prevail. But on these facts it must fail. The police claim that they would have called parole, but they had not done so despite the fact that several officers had been left waiting outside the apartment for a considerable period in the hope of gaining entry by consent. There is no evidence that parole would have visited the apartment speedily, if at all, or that the police would have devoted the resources necessary to secure the apartment – and thus prevented disposition of any evidence it contained – until parole did so.

Considering these circumstances in their totality, the government has failed to demonstrate that Alipio voluntarily consented to the search. The police officers' polite treatment does not outweigh the coercive effect of a false promise that a warrant would issue, particularly

---

[70]    701 F. Supp. 440 (S.D.N.Y. 1988).

[71]    *Id.* at 446.

when coupled with the threat of arrest, which is discussed below in greater detail.

    B.    *Munoz's Consent*

        The government next argues that Munoz voluntarily consented to the search and that this consent provides a basis independent of Alipio's consent to deny suppression of the gun.  It correctly identifies that an officer's failure to read a defendant the *Miranda* warnings before asking him to consent to a search does not violate the defendant's constitutional rights where the consent is voluntary.[72]  It argues further that the Sergeant Pasquale's statement that Munoz's father and others in the apartment would be arrested if Munoz did not consent and confess was not sufficiently coercive to invalidate voluntariness under *United States v. Memoli*,[73] which upheld consent given in exchange for a promise that the police would not arrest or pursue accessory charges against the defendant's girlfriend.[74]

        Courts in this district have held that a police threat to arrest a suspect's loved ones undermines the voluntariness of consent where the police lack probable cause to make such arrests.[75]  The logic is identical to the that discussed above in reference to a threat to obtain a search warrant.  Where the police have an honest basis for their statement, it is not coercive to make it.  But false threats made in order to obtain consent deprive the suspect of a free and informed choice based on the realities before him.

---

[72]

      *See United States v. Patane*, 542 U.S. 630, 642 (2004).

[73]

      333 F. Supp.2d 233 (S.D.N.Y. 2004).

[74]

      *Id.* at 237-38.

[75]

      *E.g.*, *Guzman*, 724 F. Supp. 2d at 443.

As an initial matter, the Court considers whether Sergeant Pasquale threatened to arrest Munoz's family.  Sergeant Pasquale testified that he told Munoz that he "would like him to give me consent.  But if he said no and then his father gave consent and we did recover a firearm, if the gun did belong to Mr. Munoz and he said it did not, that the other occupants of the house were subject to arrest, that they could be arrested"[76] and that "[i]f it's yours, and you admit to it being yours, then nobody else in the house will be arrested."[77]  The Court finds that these statements  were designed to, and did, convey the impression that Munoz's family members would be arrested if a firearm were found unless Munoz consented to the search.  That Sergeant Pasquale testified to having used terms such as "could be" and "would be subject to" does not alter the outcome here because assuming he did so, the intent was clear and it was understood as intended.  Perhaps the most persuasive evidence of this is Munoz's emotional reaction to Sergeant Pasquale's statements.  Moreover, the latter statement clearly implied that failure to confess would result in the arrest of others in the apartment.

Next, the Court considers whether the government has sustained its burden of showing that it had probable cause to arrest anyone in the apartment.  The government has introduced scant evidence in support of a theory of constructive possession.[78]  It points only to Sergeant Pasquale's testimony that if the gun "was in the common area of the living room, all

---

[76]    Tr. at 28:17-21.

[77]    *Id.* at 55:21-22.

[78]    The government argues that "the occupants could be arrested under a number of different theories, including but not limited to constructive possession," but it does not identify any. The Court therefore considers only whether there was probable cause to arrest Alipio and the others for constructive possession.

persons inside the apartment could – are subject to arrest."[79]  This is insufficient.  New York law requires that the "the [government] [] show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized."[80]  Where "a weapon [is] found in an area occupied by several people and where no one individual could be said to have dominion and control of the weapon," the prosecution bears a "heavy burden of establishing the ownership."[81]  In most instances, constructive possession is established by showing that "the defendant had ready access to the weapon or its storage place and that he admitted owning or using the weapon."[82]

As co-tenants, Alipio, Christopher, and Gilberto arguably would have had dominion and control over any common spaces in the apartment.  It is not clear, however, that they had dominion and control over the living room area in which Christian slept and where he kept his belongings.  This was the only section of the apartment that the officers requested permission or intended to search.[83]  What is more, Sergeant Pasquale testified that "[t]he only information [he] had about a gun allegedly in apartment 1B was that it belonged to Mr. Munoz" and he did not have "any

---

[79]   Tr. at 55:6-9.

[80]   *People v. Manini*, 79 N.Y.2d 561, 573, 594 N.E.2d 563, 569 (1992).

[81]   *People v. Roberson*, 41 N.Y.2d 106, 109, 359 N.E.2d 408, 410 (1976).

[82]   *People v. Vastola*, 70 A.D.2d 918, 918, 417 N.Y.S.2d 287, 287 (2d Dep't 1979) (citation omitted).

[83]   Tr. at 109:11-12 ("Yes. I don't know who but it was explained to him that we were limiting our search to where Christian was sleeping.").

information to indicate that [Munoz's] father knew he had a gun."[84]  These facts all weigh against a determination here that the police had reason to believe that Alipio or anyone else other than Munoz had dominion and control over the gun or the immediate area in which it was kept.

In *United States v. Ortiz*,[85] a court in this district held in similar circumstances that an inculpatory statement was involuntary.  There, the defendant lived in an apartment with his mother, who was the registered tenant.[86]  The police searched the apartment after receiving a tip that there was an illegal weapon there.[87]  After recovering the weapon in the pocket of a man's coat found in a closet in which the defendant stored his belongings, the police arrested the defendant and threatened to arrest his mother and another resident if the defendant did not confess that he owned the gun.[88]  The court suppressed his confession, holding that it was coerced because the police did not have probable cause to arrest anyone other than him.[89]

The facts in *Ortiz* resemble closely the facts of this case.  Both cases involved threats to arrest third parties who, to all appearances, were innocent of any wrongdoing.  Here, although the police had not yet located the weapon when they threatened to arrest the apartment's inhabitants, the police officers' testimony demonstrates that they believed that the weapon was among Munoz's

---

[84]      *Id.* at 52:13-24.

[85]      943 F. Supp. 2d 447 (S.D.N.Y. 2013).

[86]      *Id.* at 458.

[87]      *Id.* at 450.

[88]      *Id.* at 452-53, 458.

[89]      *Id.* at 458.

belongings and that Munoz owned it.

*Memoli*, relied upon by the government, is distinguishable.  The police there had credible information that the defendant owned and was in the process of selling up to fifteen guns, which he stored in an apartment that he shared with his girlfriend.[90]  Considering the size of the cache and that the relationship at issue was intimate, it was reasonable for the police to believe that the girlfriend was aware of the guns' presence in the apartment and likely had dominion and control with Memoli over the premises.  The police accordingly would have had probable cause to arrest her.  By contrast, Munoz slept and kept his belongings in one area of an apartment that he shared with three other adult men.  There was no reason to believe that Alipio, Christopher, or Gilberto ever would have seen or that Munoz would have told them about the gun.

Thus, because the government has failed to show that the police had probable cause to arrest Alipio and the apartment's other inhabitants, it has not demonstrated by a preponderance of the evidence that Munoz consented voluntarily to the search.

### C.   *Inevitable Discovery*

The government in a single sentence and a footnote of its memorandum argues that the gun's discovery was inevitable absent consent.  This contention proceeds on the assumption that the police would have notified Munoz's parole officer and that he would have recovered the weapon.  The government has failed to demonstrate, however, "that each of the contingencies necessary to

---

[90]

*Memoli*, 333 F. Supp. 2d at 234-35, 237.

the legal discovery of the contested evidence would be resolved in the government's favor."[91] Sergeant Pasquale testified only that he would have called parole that night if he had been unable to obtain consent.  He did not know if or when parole would search for the weapon because such determinations are "up to their resources or their policy."[92]  Thus, the government's argument that the parole officer inevitably would have searched for and found the gun is based entirely on speculation and conjecture.  It falls far short of the standard described in *Heath* and *Stokes*.

IV.    *Munoz's Inculpatory Statements*

Munoz moves also to suppress two inculpatory statements that he made regarding the gun's location and his ownership thereof.

A.    *The Location of the Gun*

Prior to advising Munoz of his *Miranda* rights and while attempting to obtain consent to search the apartment, Sergeant Pasquale asked Munoz where in the apartment the gun was located.  Munoz described accurately the gun's location.

The government argues that this statement is admissible under *New York v. Quarles*,[93] in which the Supreme Court established a public safety exception to *Miranda*.  It held that where "the need for answers to questions in a situation posing a threat to the public safety outweighs the

---

[91]

United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013) (quoting *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006)).

[92]

Tr. at 51:23-52:6.

[93]

467 U.S. 649 (1984).

need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination," the police may ask questions related to public safety before reading a suspect the *Miranda* warnings.[94]   There was no such need for answers to public safety questions here.

Perhaps most persuasive is that the police did not at any time conduct a safety sweep of the apartment.   It is unpersuasive for the government to acknowledge, on the one hand, that the police did not feel sufficiently threatened to look around the apartment for weapons in plain view or to ensure that the all of the apartment's inhabitants were accounted for while arguing, on the other hand, that they were in enough danger that some unsecured individual would locate the weapon and use it against them to justify pre-*Miranda* questioning under *Quarles*.   The police were inside the apartment for quite some time – long enough for them to make small talk with Christopher, for Gilberto to return home, for Alipio to give consent to search, and for the search to begin – before Sergeant Pasquale asked Munoz where the gun was located.   Moreover, unlike in *United States v. Estrada*,[95] cited by the government, the defendant was not even in the apartment, let alone anywhere near the suspected weapon, when the police asked the *Quarles* questions.   There was no arrest in progress and this was not a highly charged environment.   To the contrary, the police testified that everyone in the apartment was calm.

Accordingly, it was not objectively reasonable to believe that the officers' safety was in danger such that *Quarles* questioning was appropriate.   Indeed, holding otherwise would open the door to the police arresting a suspect who may or may not have a weapon in his home, later entering the home without a warrant, and then questioning the suspect without *Miranda* warnings under the

---

[94]
   *Id.* at 657.

[95]
   430 F.3d 606 (2d Cir. 2005).

guise of the public safety exception.  Such a result would be untenable.

B.    *The Confession*

At approximately midnight – three hours after obtaining Munoz's consent to search the apartment and his statement about the gun's location – the police read Munoz the *Miranda* warnings and elicited a confession.

The government argues that Munoz confessed voluntarily with full knowledge of his *Miranda* rights and that the confession therefore is admissible.  Munoz relies on *United States v. Anderson*[96] and *Oregon v. Elstad*[97] in arguing that his first inculpatory statement was involuntary and that his subsequent statement was tainted by it and accordingly must be suppressed.

"[T]he use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second, even if the latter was obtained after properly administered *Miranda* warnings."[98]  In determining whether an initial statement has tainted a second, courts should consider a variety of factors, including "the time that passes between confessions, the change in place of interrogations, and the change in identity of interrogators."[99]

The Court already has found that Munoz's first statement was involuntary in light of Sergeant Pasquale's threat to arrest his father.  Thus, the only question remaining is whether the

---

[96]    929 F.2d 96 (2d Cir. 1991).

[97]    470 U.S. 298 (1985).

[98]    *Anderson*, 929 F.2d at 102.

[99]    *Id.* (quoting *Elstad*, 470 U.S. at 310).

second confession was tainted by the first.

The two sessions took place in the same location at the police precinct and were separated by only three hours.  The government states in its brief that Officer Fidanza, not Sergeant Pasquale, read Munoz his *Miranda* rights.[100]  Based on his testimony and the government's briefing, however, it is clear that Sergeant Pasquale was at the very least present when the police elicited the confession.[101]  Moreover, only a few hours earlier, Sergeant Pasquale had stated to Munoz if "you admit to it being yours, then nobody else in the house will be arrested."[102]  Munoz's confession was designed to satisfy that agreement.  Indeed, this was the only point at which Munoz admitted that he owned the gun.

In light of the temporal and spatial proximity and the fact that Munoz by all appearances only fulfilled his end of the bargain with Sergeant Pasquale when he made a full confession that he owned the gun, the Court finds that his written and verbal confessions were tainted by his earlier involuntary and un-Mirandized statements.

---

[100]    Gov. Br. [DI 10] at 7.

[101]    *Id.* at 7; Tr. at 32:6-10.

[102]    Tr. at 55:21-22.

*Conclusion*

For the foregoing reasons, Munoz's motion to suppress [DI 3] is granted.


SO ORDERED.

Dated:          December 18, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)